# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re: | |
| GORDON PROPERTIES, LLC, | Case No.   09-18086-RGM |
| Debtor. | (Chapter 11) |
| GORDON PROPERTIES, LLC, | |
| Plaintiff, | |
| vs. | Adv. Proc. No. 09-1304 |
| FIRST OWNERS' ASSOCIATION OF FORTY SIX HUNDRED CONDOMINIUM, INC., | |
| Defendant. | |

## MEMORANDUM OPINION

This case is before the court on Gordon Properties, LLC's Motion for a Preliminary Injunction to Enforce Automatic Stay and First Owners' Association of Forty Six Hundred Condominium, Inc.'s opposition.  The debtor asserts that the unit owners association denied it the right to vote at the October 7, 2009 annual meeting in violation of the automatic stay, 11 U.S.C. §362(a), and requests that the annual meeting which was adjourned sine die be reconvened.  The court will deny the motion.  While the actions of which the debtor complains were an abuse of power, they were not an effort to collect a pre-petition debt.

1

## Background

Forty Six Hundred Condominium consists of a main high-rise apartment building with both residential and commercial units and two commercial units adjacent to the high-rise building. One of the adjacent commercial units, a restaurant, is owned by the debtor. A dispute arose some years ago about the proper amount of condominium assessments that the restaurant unit should pay. The Board of Directors levied a significant condominium assessment against the restaurant unit which resulted in a number of law suits in state court. A judgment in favor of the unit owners association is presently on appeal to the Supreme Court of Virginia. The debtor owned a total of forty condominium units at the time of the 2009 annual meeting which constituted 19.7179% of the votes in the unit owners association.

The debtor was denied its right to vote as to all its condominium units at the 2007 and 2008 annual meetings and a special meeting held in June 2009, because it was delinquent in the payment of its condominium fees on the restaurant unit. By-Laws Article IV, Section 7.[1] No annual meeting has been held since 2006 because there was no quorum at the 2007 or 2008 annual meetings or at the June 2009 special meeting. A quorum is a majority of votes in the unit owners association. By-Laws Article IV, Section 5.[2] The members of the Board of Directors serve two-year terms, but

---

[1]Article IV, Section 7 of the By-Laws provides:

Section 7. Voting. At every meeting of the members, each member present, in person or by proxy, shall have the right to cast the vote assigned to his Unit . . . on each question for each membership which he owns. . . . No member shall be eligible to vote, either in person or by proxy, or to be elected to the Board of Directors who is shown on the books or management account of the Owners' Association to be more than thirty (30) days delinquent in any payment due the Owners' Association.

[2]Article IV, Section 5 of the By-Laws provides:

Section 5. Quorum. The presence, either in person or by proxy, of members representing at least a majority of the total votes of the Condominium Project shall be requisite for, and shall constitute a quorum for the transaction of any business which affects the rights and duties of all unit owners.

2

remain in office until their successors are elected.[3]  The Board presently consists of seven members, four of whom are hold-over directors.  They were elected in 2005 and 2006 and continue to hold office until their successors are elected.  Three members were appointed to the Board by the incumbent members to fill vacancies.  By-Laws Article V, Section 6.[4]

The assessment against the restaurant unit was unpaid when this bankruptcy case was filed on October 2, 2009.  The debtor immediately sought a preliminary injunction asserting that enforcement of Article IV, Section 7 of the By-Laws violated the automatic stay imposed by §362 of the United States Bankruptcy Code because it was an act to collect a pre-petition debt.  It sought to enjoin the unit owners association from denying it the right to vote at the annual meeting scheduled to be held on October 7, 2009.  The hearing on the motion was held on October 7, 2009, just hours before the annual meeting was scheduled to commence.  Without deciding whether enforcement of Article IV, Section 7 violated 11 U.S.C. §362(a), the court declined to issue a preliminary injunction because the short time the parties had to prepare for the hearing was insufficient to permit them to be fully prepared for the hearing.

### The October 7, 2009 Annual Meeting

------

[3]Article V, Section 5 of the By-Laws provides:

Section 5.  Election and Term of Office. .   .  . At the expiration of the initial term of office of each respective elected Director, his successor shall be elected to serve a term of two (2) years.  The Directors shall hold office until their successors have been elected and hold their first meeting.

[4]Article V, Section 6 of the By-Laws provides:

Section 6.  Vacancies.  Vacancies among the elected Directors caused by any reason other than the removal of a Director by a vote of the membership shall be filled by vote of the majority of the remaining Directors, even though they may constitute less than a quorum; and each person so elected shall be a Director until a successor is elected by all the members at the next annual meeting to serve out the unexpired portion of the term.

The annual meeting was called to order a few hours after the court hearing on October 7, 2009. A quorum was ostensibly not present.[5] Members representing 38.1467% of the votes of the unit owners association registered for the meeting.[6] The debtor registered its 19.7179% of the votes of the association. Two other individuals who, independently of the debtor, solicited and obtained proxies also registered themselves and their proxies. Of the remaining 18.4288% of the vote that registered for the meeting, the two individuals held about 15% of the total votes. The debtor and the two individuals held the overwhelming majority of the votes registered, approximately 92%.

The Chairman of the Elections Committee reported to the Chair of the annual meeting that there was no quorum. The Chair then announced that there was no quorum, asked for a motion to adjourn, recognized the Chair of the Elections Committee who moved to adjourn, heard a second, took a voice vote, announced that the motion passed and, without recognizing anyone else or providing sufficient time for anyone else to speak or seek recognition, adjourned the meeting.

In fact, the motion was defeated by an overwhelming majority. The debtor and the two individuals holding proxies all voted against the motion.

The vote was significant. The vote to adjourn sine die, that is, adjourn without setting a date to reconvene, meant that there would be no annual meeting and no election of members of the Board of Directors until the next annual meeting a year away. The incumbent directors remained in office

---

[5]Three members of the Board of Directors and the Chair of the Elections Committee were present at the meeting. None registered. None was counted as part of the quorum. By-Laws Article IV, Section 5 as well as the Virginia Condominium Act define quorum in terms of presence. Presence, as the By-Laws states, is "either in person or by proxy." Va.Code (1950) 55-79.76(a) and By-Laws Article IV, Section 5. Whether one votes or does not vote, wants to vote or does not want to vote, does not change the fact that one is either present (in person or by proxy) or not present. Their presence brought the meeting closer to a quorum. The presence of other unit owners who did not register raises the question of whether a quorum was, in fact, achieved.

[6]The procedure the unit owners association utilized was to register individuals and proxies at the door of the meeting. Only those who registered were counted for quorum purposes and were entitled to vote.

because no successors were elected.  (Their terms expired in 2007 and 2008.)  All proxies expired.

A motion to adjourn to a specific date would have adjourned the meeting to a particular date to allow

further efforts to obtain a quorum.  The proxies would not have expired and could have been

exercised at the adjourned meeting.

The debtor asserts that the unit owners association denied it its vote in violation of the

automatic stay.  The unit owners association asserts that enforcement of Article IV, Section 7 of the

By-Laws does not violate the automatic stay and that it did not, in fact, deny the debtor its right to

vote.

## Discussion

### Does Enforcing By-Laws Article IV, Section 7 Violate the Automatic Stay?

The automatic stay prohibits all acts to collect a pre-petition debt.[7]  Not only are significant

acts such as suing a debtor or enforcing a judgment prohibited, but less dramatic acts are also

prohibited.  For example, mailing bills even though there is no threat to sue or take other collection

action violates the automatic stay.  *In re Robinson,* 2008 WL 4526183 (Bankr.E.D.Va.2008) ("By

sending the invoices to the debtor, [the creditor] effectively sought payment of the prepetition

amounts outside of the bankruptcy case, and as such, her actions violated the automatic stay"); *In

re Torres Lopez,* 2006 WL 3898307 (Bankr.D.P.R. 2006) (collection letter advising that water,

electricity and phone services in a condominium would be discontinued if payment was not

received); *In re Crudup,* 287 B.R. 358 (Bankr.E.D.N.C.2002) (letters to debtor's wife and parents-

in-law); *In re Wills,* 226 B.R. 369, 378 (Bankr.E.D.Va.1998) (sending invoices post-petition); *In re*

---

[7]Section 362(a)(6) provides that "a petition .   . operates as a stay, applicable to all entities, of .   . any act
to collect, assess, or recover a claim against the debtor that arose before the commencement of the case."

5

*Smith,* 185 B.R. 871 (Bankr.M.D.Fla.1994) (letter to debtor's employer); *Sechuan City, Inc. v. North American Motor Inns, Inc. (In re Sechuan City, Inc.),* 96 B.R. 37 (Bankr.E.D.Pa.1989) (landlord posted signs at debtor-restaurant urging public not to patronize restaurant); *In re Aponte,* 82 B.R. 738 (Bankr.E.D.Pa.1988) (landlord's termination of electric service). Denying a condominium unit owner the right to vote at an annual or special meeting because pre-petition condominium fees are past due is similarly prohibited. It pressures a unit owner to pay his past due, pre-petition condominium fees.

The unit owners association argues that this case is different. It argues that the unit owners association is not denying the debtor its right to vote. Under Article IV, Section 7, it argues, a unit owner's right to vote exists only if the unit owner is not more than thirty days past due in the payment of his condominium fees. Since the debtor is past due in the payment of condominium fees, it just does not have a right to vote in the first place. Thus, the unit owners association is not taking any action to deny the debtor his right to vote.

Alternatively, the unit owners association argues, the debtor's right to vote is limited or encumbered with the restriction that it may not be exercised if a unit owner is more than thirty days past due in the payment of his condominium fees. In this case, the restriction or encumbrance arose prior to the filing of the petition in bankruptcy. Under the Bankruptcy Code, property of a debtor that becomes property of the estate does so subject to all restrictions existing when the petition in bankruptcy is filed. Thus, the unit owners association is not taking any action to deny the debtor its right to vote because the debtor's right to vote was restricted at the time it filed bankruptcy.

The arguments are not well taken. The fact remains, Article IV, Section 7 pressures the debtor to pay its past due pre-petition condominium fees. If the debtor pays the pre-petition

6

condominium fees, it can vote.  If it does not pay them, it cannot vote.  The ability to vote is determined by whether the debtor pays the pre-petition debt.  He is penalized if he does not and is rewarded if he does.[8]

The Virginia Condominium Act makes clear that when a condominium unit owner's right to vote is created, it is not created subject to a condition, a limitation or a restriction.  The right to vote is an intregal and inseparable part of the condominium regime itself.  At this condominium, and in most others, votes are allocated in accordance with the undivided interests in the common elements.  Va.Code (1950) §55-79.77(a).  The undivided interests in the common elements was determined under Va.Code (1950) §55-79.55(a).  The undivided interest in the common elements allocated to each unit may not be altered and may not be separated from the unit itself.  Va.Code (1950) §55-79.55(f).  The number of votes appertaining to any unit may not be altered.  Va.Code (1950) §55-79-71(E).  These provisions may not be altered by agreement and may not be waived.  Va.Code (1950) §55-79.41:1.  While the number of votes appertaining to a condominium unit or the weight of a particular unit owner's vote may vary, every unit owner has the right to vote.  The right to vote does not fade in and out depending on whether condominium fees are paid or unpaid or on any other circumstance.   Each condominium unit has as an inseparable bundle of rights that constitutes the condominium unit.  The right to vote is a part of those inseparable rights.

The unit owners association's alternative argument, that Article IV, Section 7 is a restriction on the right to vote that is effective in bankruptcy is not well taken either.  One Virginia circuit court held that a unit owner's right to vote may be restricted for non-payment of condominium fees. *Clark*

---

[8]A chapter 11 debtor may not pay pre-petition creditors after filing bankruptcy without court authorization.  The purpose is to prevent some creditors from being favored over others, either because the debtor likes them or because the creditor can exert pressure to favor it over other creditors.  One principal of bankruptcy is the equal treatment of all creditors.

*v. Bay Point Condo Ass'n, Inc.,* 2003 WL 23095986 (Va.Cir.Ct.2003) (revocation of voting rights permissible under Va.Code (1950) §55-79.80:2(C)).  However described, the restriction becomes effective only upon non-payment of condominium fees for a period of thirty days and has the intended effect of coercing payment of the delinquent fees just like other remedies the unit owners association has, such as suing for the unpaid condominium fees or filing and enforcing a lien. Va.Code (1950) §55-79.84.

    *Unit Owners Ass'n of BuildAmerica-1 v. Gillman,* 223 Va. 752, 292 S.E.2d 378 (1982) and Va.Code (1950) §55-79.80:2 are instructive.  In *Gillman,* the unit owners association imposed monetary fines against Gillman for violating the condominium's rules and regulations.  The Virginia Supreme Court held the unit owners association could not impose monetary fines without statutory authority and that there was no such statutory authority.  The Virginia General Assembly responded by enacting what is now Va.Code (1950) §55-79.80:2 which expressly grants the authority to impose penalties for failure to timely pay assessments.  Va.Code (1950) §55-79.80:2(A) only expressly allows suspension of a unit owner's right to use facilities or services for nonpayment of assessments more than sixty days past due and assessment of charges for violations of the condominium documents or the rules or regulations of the condominium.  While it does not specifically address the suspension of the right to vote, Subsection C (a general provision carried over from Va.Code (1950) §55-79-80, the predecessor of Va.Code (1950) §55-79-80:2) provides that the statute will not be "construed to prohibit the grant, by the condominium instruments, of other powers and responsibilities" to the unit owners association of the Board of Directors.  Va.Code (1950) §55-79.80:2(C).  The circuit court in *Clark v. Bay Point Condo Ass'n, Inc.,* viewed this subsection as authority for a unit owners association to suspend voting rights while condominium fees are past

8

due.  *Gillman, Clark* and Va.Code (1950) §55-79.80:2 show that the suspension of a unit owner's

right to vote is a remedy for nonpayment of condominium fees.  Like other remedies, it can be

effective.  For example, Jane Brungard testified in this case that she paid $555 in fines so she could

vote and run for the Board of Directors.[9]  While the use of Article IV, Section 7 may be an effective

remedy, when a petition in bankruptcy is filed the automatic stay prevents its further application.

If the unit owners association properly invoked Article IV, Section 7 pre-petition, it must

stop using it when the unit owner files bankruptcy.  A creditor who properly takes an act prior to the

filing of a petition in bankruptcy to collect a debt, must stop the act upon the filing of the petition.

"It is well established that even a technical stay violation (one committed without knowledge of the

stay) can become willful .   .   . if the creditor fails to remedy the violation after receiving notice of

the automatic stay."  *Kline v. Tiedemann (In re Kline),* 424 B.R. 516, 524 (Bankr.D.N.M.2010).  A

creditor who caused a state court to issue a civil bench warrant for the arrest of a debtor who, pre-

petition, failed to appear in state court to answer interrogatories must cause the bench warrant to be

withdrawn when the debtor files bankruptcy.  *Galmore v. Dykstra (In re Galmore),* 390 B.R. 901,

909-914 (Bankr.N.D.Ind. 2008).  A creditor who issued a garnishment before a debtor files

bankruptcy has the affirmative duty to promptly dismiss the garnishment upon filing of the

bankruptcy petition.  *In re Manuel,* 212 B.R. 517, 519 (Bankr.E.D.Va. 1997);  *Baum v. United Va.*

*Bank (In re Baum),* 15 B.R. 538, 541 (Bankr.E.D.Va. 1981) (creditor has the "responsibility to stop

---

[9]Ms. Brungard testified that she was fined a total of $555 because on one occasion she accompanied Ms.
Hernandez into the manager's office and on another spoke with Mr. Cunningham, an attorney who apparently had
previously represented the unit owners association.  She further testified:

I feel like both of those were false charges.  The only reason I paid the $555 was because if I didn't
pay it, I would be delinquent and would not have been able to run for the board.  So it was to me a
purely kangaroo court that they set up, but I paid it in order to run for the board.

Tr. at 93.

the downhill snowballing of a continuing garnishment."); *In re Scroggin,* 364 B.R. 772, 779 (10th Cir.BAP 2007).  A creditor who repossessed a debtor's car pre-petition, but has not sold it before the debtor files bankruptcy, must release the car back to the debtor.  *In re Brown,* 237 B.R. 316 (Bankr.E.D.Va. 1999); *In re Young,* 193 B.R. 620, 621 (Bankr.D.D.C. 1996) (seized vehicle must be returned upon debtor giving adequate assurance).  This case is no different.  If the act to collect the past due condominium fees (that is,  invoking Article IV, Section 7 denying the debtor its right to vote) commenced before the bankruptcy was filed, the unit owners association must stop the act after the filing of bankruptcy by permitting the debtor to vote.  The fact that the penalty for not timely paying condominium fees is in the By-Laws changes nothing.  It is an act, and, if continued, violates the automatic stay.

The court concludes that enforcing By-Laws Article IV, Section 7 for a pre-petition condominium fee violates the automatic stay.

## Did the Unit Owners Association Deny the Debtor its Right to Vote?

The unit owners association next contends that even if denying the debtor the right to vote at an annual meeting violates the automatic stay, it did not, in fact, deny the debtor its right to vote. In order to decide this issue, the court must determine what happened at the annual meeting.

Eight witnesses who were present at the meeting testified at the hearing.  The testimony focused on two principal issues: Did Jane Brungard or Kevin Broncato first seek recognition from

the Chair, Dee Cuadros?  Was there sufficient time after the voice vote was taken on the motion to

adjourn for a unit owner to request a division of the assembly?[10]

Ms. Cuadros, the president of the association, chaired the annual meeting.  While the proxies

were being tallied to determine whether a quorum was present, the minutes of the last meeting were

read and the association's attorney gave a report.  Ms. Cuadros testified as to what then happened:

> Q       Did there come a time during the meeting when you were informed whether
>         a quorum had been obtained?
>
> A       Yes.
>
> Q       And who informed you of this?
>
> A       Kevin Broncato.
>
> Q       And what did you do when you were informed that no quorum had been
>         obtained?
>
> A       I read the – he gave me this document that tells what the numbers were.  I
>         read them to the – to the meeting and then I indicated that no business could
>         be conducted because there was no quorum for the meeting and I was
>         attempting to ask for a – a motion to adjourn when Jane [Brungard] popped
>         up with her motion which I declared her out of order and the first hand that
>         – that went up was Kevin Broncato's and so I called on him to make the
>         motion which he did.

Tr. 134-135.[11]

---

[10]A division of the assembly is the request by any member to have a voice vote taken a second time, but by a
different method, such as rasing hands or standing.  ROBERT'S RULES OF ORDER NEWLY REVISED §4 at 49-50.  (Sarah C.
Robert et al. eds., De Capo Press, 10th ed. 2000).

[11]Ms. Cuadros also testified:

> Q       After you made the determination that a quorum did not exist, you asked for a motion to
>         adjourn, didn't you?
> A       I did.
> Q       And the first person to respond was Jane Brungard who moved to adjourn for 30 days, is that
>         correct?
> A       Jane Brungard did respond.  She was not – she was not selected to make that –
> Q       You didn't select her?

(continued...)

Other witnesses also testified to what happened and who first sought recognition of the Chair. The testimony is conflicting. Both counsel sought to show that some of the witnesses were in a better physical position to know who first sought recognition. After reviewing all of the evidence, the court concludes that while both Mr. Broncato and Ms. Brungard were substantially simultaneous in seeking recognition, Ms. Brungard was, in fact, first. The court reaches this conclusion because Ms. Cuadros, before recognizing Mr. Broncato, heard Ms. Brungard speak, looked at her, and spoke to her, ruling her out of order. Only then did she turn to Mr. Broncato and recognize him.[12]

---

[11](...continued)
A    No, I didn't.
Q    But she was the first person to jump up and move to – to adjourn?
A    She jumped up and – and moved to adjourn.
Q    She was the first person to, is that right?
A    She was not the first person to raise her hand or his hand to make that motion.
Q    She was the first person to speak?
A    She was the first person to speak, which she often is.
Q    And you told Ms. Brungard that you would not recognize her because Mr. Broncato, who was sitting in the back of the room had his hand up first?
A    That is correct.

Tr. at 24-25.

[12]It appears that Ms. Cuadros ruled Ms. Brungard out of order because Ms. Brungard stood and sought recognition while Ms. Cuadros expected members to raise their hands and wait to be recognized. Ms. Cuadros testified that "[M]y understanding of the process is that once I ask for the motion, I expect the – whoever wants to make a motion would raise their hand and wait to be recognized before they start talking and I – I ask the first one who hand goes up, if I possibly can." Tr. at 139. The association, Ms. Cuadros further testified, follows Robert's Rules of Order, which are to the contrary. ROBERT'S RULES OF ORDER NEWLY REVISED states:

**Obtaining and Assigning the Floor**

Before a member in an assembly can make a motion or speak in *debate* . . . he must *obtain the floor;* that is, he must be *recognized* by the chair as having the exclusive right to be heard at that time. . . .

To claim the floor, a members rises at his place when no one else has the floor . . ., faces the chair, and says, "Mr. President," or "Mr. Chairman," or "Madam Chairman," or whatever is the chair's proper title. If the member is entitled to the floor at the time, the chair recognizes him.

ROBERT'S RULES OF ORDER NEWLY REVISED §3 at 28. (Sarah C. Robert et al. eds., De Capo Press, 10th ed. 2000).

The second question that the parties focused on was whether there was adequate time after the vote on Mr. Broncato's motion was taken for the debtor – or any other unit owner – to request a division of the assembly, that is, for the vote to be taken again but with the proponents and opponents standing or using some method more reliable than a voice vote.  The unit owners association argued that the failure to make such a request when the request could have been made showed that there was no denial by the unit owners association of the debtor's right to vote.  The debtor simply did not fully exercise its rights in this instance.  The debtor responded that the undue speed with which the vote was taken, the result was announced and the meeting was adjourned denied it the ability to seek a division and was a part of the denial of its right to vote.

Again, the eight witnesses who attended the meeting had similar, but not identical recollections.  Generally, those in favor of the motion to adjourn testified that there was sufficient time and those against the motion that there was not enough time.  Ms. Cuadros testified about the vote.  She testified, commencing immediately after her testimony set out above:

Q      What motion did he make?

A      [Kevin Broncato] made a motion to adjourn.

Q      Was it seconded?

A      Yes, it was.

Q      And what did you do then?

A      I waited a reasonable amount of time and then I adjourned the meeting.

Q      Well, did you ask for a vote on the motion?

A      Oh, yes, I did.  Absolutely.

Q      And what type of vote was taken?

13

A    It was voice vote and clearly the ayes had it and so after a reasonable amount of time, as I said, I declared the meeting adjourned.

Q    And can you explain to the Court how you went about proceeding with the voice vote?  What did you say to the people gathered at the meeting?

A    I said, "All those in favor of adjourning the meeting, please say aye."

Q    And was there a response to that?

A    There was.

Q    What did you do then?

A    Then I asked if there were any opposed to it and there were some people that – some voices that did not want the adjournment.

Q    Do you know who those were?

A    I have no idea.

Q    And based on what you heard, what did you do then?

A    I told the meeting that the ayes had it and I adjourned the meeting.

Q    And did you wait any period of time between saying the ayes have it and adjourning the meeting?

A    It was a reasonable amount of time, yes.

Q    Did anyone attempt to make a motion during that time?

A    No.

Q    You know Lindsay Wilson, correct?

A    Yes, I do.

Q    And she was present at the meeting?

A    She was.

Q    Do you know how Gordon Properties voted on the motion to adjourn?

14

A      No, I don't.

Q      Did Gordon Properties make any motions after you stated that the motion to adjourn had carried?

A      No, they didn't.

Q      And you then concluded the meeting?

A      I then concluded the meeting, yes.

Tr. at 135-136.

Lindsay Wilson, the representative of the debtor, testified to the same event:

Q      And after Mr. Broncato made his motion to adjourn, tell me what Ms. Cuadros did?

A      Someone – someone quickly seconded the motion and Ms. Cuadros very, very quicky, almost more quickly than my ear could hear it and it could get to my brain and process what was happening, Ms. Cuadros asked, "Any yeas? Any nays?" and people – it was such a cacophony of sounds. It was almost happening – it appeared to be happening simultaneously, but there were yeas and nays being shouted from the audience at that time.

Q      And then what did she – what did she do?

A      Then she made some motion. I don't know if she shut – slammed a book, rapped her hand on the table, some motion and said, "We are adjourned" so quickly my head was spinning.

• • •

Q      In your estimate, Ms. Wilson, in the time that Ms. Cuadros asked for the motion to adjourn until the time that she slapped down and said meeting adjourned, how much time elapsed?

A      Oh, my. It was a matter of seconds. It was stunningly fast. It felt – I – I couldn't even process that it had happened. I felt like – I felt like a card trick had just been played in front of me. I was – it took my breath away. It – 10 seconds, maybe.

Tr. at 78-79.

Ms. Brungard testified that "it happened within seconds.  It was very fast."  Tr. at 89.

Martina Hernandez agreed.[13]  Richard Mendelson, an attorney who had been practicing law since

1969 and was appointed by the Circuit Court for the City of Alexandria as co-conservator of Julia

Langdon, one of the four members of the debtor, testified that the matter took only "[a] matter of

seconds."  Tr. at 110.

Mr. Broncato who made the motion to adjourn was asked if "there was any opportunity after

[Ms. Cuadros] said the ayes have it for a person present at the meeting to make any motion?"  He

testified that "I believe there was sufficient time.  It's – it was roughly the standard operation, the

amount of time that the vote is take at almost all meetings that I've been present at."  Tr. at 146.

Corey Brooks, a member of the Board of Directors appointed to fill a vacancy,  thought that there

was "a meaningful pause of several seconds."  Tr. 161.[14]

The ability of a unit owner to ask for a division after the vote and before Ms. Cuadros

adjourned the meeting depends not only on the elapsed time but also the orderliness of the meeting

---

[13]Ms. Hernandez testified:

Q      .  .  . From the time that Ms. Cuadros asked for a motion to adjourn until the time that she
       actually adjourned the meeting, in your estimate, how much time expired between the[m]?
A      It took less than a second.  It was pretty fast.  It was – I mean, I was amazed by how, you
       know, they were carrying the whole process and so, yeah, it was that fast.  It was less than
       a second, actually.

Tr. at 99.

[14]Lt. Brooks testified:

Q      .  .  . How much – did she – how much time passed from when the chair stated that the
       motion to adjourn carried to the time the meeting was actually adjourned?
A      Oh, there was a meaningful pause of several seconds.
Q      Enough time for someone to stand up and raise their hand?
A      Certainly.

Tr. at 161.

16

at that time.  Ms. Cuadros testified that "It was a very quiet meeting."  Tr. at 137.[15]  Mr. Broncato

agreed.[16]

Ms. Wilson disagreed.  She thought that the meeting "completely disintegrated."[17]  Mr.

Mendelson testified:

Q        Now you testified that when the motion was deemed to have carried, it was
a matter of seconds before the meeting was deemed adjourned.  Wasn't there
sufficient time for someone to stand up to be recognized?

A        Well, within those few seconds.  What happened was in the – in the – at the
point where she was taking the voice vote, there were several – lots of people
– several people speaking at once and when she declared that the ayes have
it, it was over.

Q        Well, but you said there was a matter of seconds.

A        That's right.

---

[15]Ms. Cuadros testified:

Q        Now you've heard testimony from a number of witnesses that at some point after the motion
to adjourn the meeting became disorderly, is that true?
A        No, it isn't.  It was a very quiet meeting.

Tr. at 137.

[16]Mr. Broncato testified:

Q        And at that time of the meeting, was it – was the meeting in disorder or what was going on
at that time?
A        At the time I – I wouldn't say it was in disorder.  I – I would say everyone's still in their seat
and/or standing at the side and then once the meeting was adjourned, people got up.

Tr. at 146.

[17]Ms. Wilson testified:

At that point I stood up, said, "This is not okay.  What's happening here?  Did I just see that happen?
What's going on?"  I stood in my chair, raised my hands again to say, "What is happening here?"  and
at that point the meeting had completely disintegrated.  There was no longer a forum in which
civilized speech could take place.  There was arguing and shouting. People were moving from their
seats.  The board was departing the room. It all had completely disintegrated.

Tr. at 79.

17

Q       And isn't it true that if you're sitting there, you can stand up in a second, can't you?

A       I suppose somebody could stand up if they could understand in the chaos what was going on.

Q       But nobody did that on behalf of Gordon Properties, right?

A       Not that I saw under the circumstances, but it was a matter of confusion.

THE COURT:       Excuse me.  Would you repeat the last answer: I didn't hear it.

THE WITNESS:       Not that I saw.  There was quite a bit of confusion and in the course of that, Ms. Cuadros says, "We're adjourned."

Tr. at 113-114.

The court concludes that the meeting was an orderly meeting until Ms. Cuadros as chair of the meeting announced that there was no quorum and invited a motion from the floor.  From that moment on, the meeting became increasingly disorderly.[18]  At all times, Ms. Cuadros had the ability to bring the meeting to order but failed to do so and pressed forward with Mr. Broncato's motion to adjourn sine die.  The court finds that in light of the growing disorder of the meeting, there was insufficient time within which any member could reasonably have requested a division of the assembly or otherwise objected to the motion or the ruling of the chair.

These acts and the conduct of the unit owners association denied the debtor its right to vote.

---

[18]In any meeting such as the annual meeting under consideration, individual's perceptions and recollections of what transpired vary.  People were seated throughout the room.  Each had a better vantage point for some observations and a poorer vantage point for other observations.  It is unlikely that everyone heard every word spoken.  There were competing demands for attention.  There were competing objectives.  There were different motives.  All of these factors color an individual's perception and recollection.  The role of the court is to determine from the evidence presented what actually happened.  In doing so, the court gives greater weight to Mr. Mendelson's testimony.  He was the only witness who had no personal stake in the process.  Although he is a co-conservator of Julia Langdon, one of the four members of the debtor, the outcome does not affect him personally and he has a fiduciary duty to Ms. Langdon.

18

## **Did the Unit Owners Association Violate the Automatic Stay?**

Simply showing that the unit owners association denied the debtor its right to vote is not enough to show a violation of the automatic stay. The two questions counsel focused on are not the best focus of inquiry to answer this question. The better inquiry is not narrowly on who should have been recognized, whether there was sufficient time for an objection to the vote or a request for a division of the assembly, or whether these acts and the other conduct were a denial of the debtor's right to vote; but, more broadly, including but not limited to, how the meeting was conducted from the time Mr. Broncato reported the absence of a quorum to the time Ms. Cuadros adjourned the meeting.

Robert's Rules of Order required that the meeting be conducted differently. After recognizing Mr. Broncato, hearing a second and stating the motion before the assembly, Robert's Rules of Order required the chair to recognize Ms. Brungard. Ms. Cuadros knew that Ms. Brungard wanted to make a motion to adjourn to a set time and date.[19] That motion is a privileged motion and is in order when a motion to adjourn sine die, that is, adjourn without fixing a date and time for meeting, is before the assembly. ROBERT'S RULES OF ORDER NEWLY REVISED §22.[20] Had Ms.

---

[19]This motion should not have been unexpected. When no quorum was obtained at the 2007 annual meeting which Ms. Cuadros chaired, the meeting was adjourned twice in unsuccessful efforts to obtain a quorum. Testimony of Ms. Cuadros. Tr. at 132.

[20]Robert's Rules of Order states:

The privileged motion to *Fix the Time to Which to Adjourn* . . . [t]akes precedence over all other motions and yields to nothing. . . . The privileged motion to *Fix the Time to Which to Adjourn* can be moved even after the assembly has voted to adjourn, provided that the chair has not yet declared the assembly adjourned.

ROBERT'S RULES OF ORDER NEWLY REVISED §22 at 235.

Robert's Rules of Order also states:

(continued...)

19

Cuadros not known what Ms. Brungard wanted to say, she still had the obligation to recognize Ms.

Brungard.  Had Ms. Brungard's comments been out of order, she could have ruled her out of order

as she had previously done.  The role of the chair is to be impartial and to assure the fair and orderly

dispatch of the business before the assembly.[21]  That means that all members who have a right to

speak should be recognized, not ignored as Ms. Brungard was in this instance.

Ms. Cuadros should have, and could have, restored order after the vote on Mr. Broncato's

motion was taken and before she announced the result of the vote.  She heard the objections to the

vote and should have interpreted them as a request for a division.  It was not necessary for Ms.

Brungard or anyone else to have been recognized before requesting a division.  ROBERT'S RULES

OF ORDER NEWLY REVISED §29 at 271 states that a division of the assembly "[i]s in order without

obtaining the floor, when another has the floor and at any time after the question has been put, even

---

[20](...continued)
The privileged motion to *Adjourn . . . [t]*akes precedence over all motions except the *privileged*
motion to *Fix the Time to Which to Adjourn . . .* It yields to the *privileged* motion to *Fix the Time
to Which to Adjourn . . .*

ROBERT'S RULES OF ORDER NEWLY REVISED §21 at 227.

[21]ROBERT'S RULES OF ORDER NEWLY REVISED § 43, discusses the chair's duty to remain impartial during
debates.  It states:

> If the presiding officer is a member of the society, he has – as an individual – the same *rights*
> in debate as any other member; but the impartiality required of the chair in an assembly precludes his
> exercising these rights while he is presiding.  Normally, especially in a large body, he should have
> nothing to say on the merits of pending questions.  On certain occasions – which should be extremely
> rare – the presiding officer may believe that a crucial factor relating to such a question has been
> overlooked and that his obligation as a member to call attention to the point outweighs his duty to
> preside at that time.  To participate in debate, he must relinquish the chair . . . The presiding officer
> who relinquished the chair then should not return to it until the pending main question has been
> disposed of, since he has shown himself to be a partisan as far as that particular matter is concerned.
> Indeed, unless a presiding officer is extremely sparing in leaving the chair to take part in debate, he
> may destroy members' confidence in the impartiality of his approach to the task of presiding.

Here, there is no question about Ms. Cuadros participating in debate.  She did not. But, the manner in which she handled
Mr. Broncato's motion to adjourn brings into question the "confidence in the impartiality of [her] approach to the task
of presiding."

after the vote has been announced"; that is "[d]oes not require a second"; and that it [d]oes not require a vote, since a single member can demand a division."

Even if Ms. Cuadros did not hear the request for a division or did not properly interpret the demands as a request for a division, she should have, on her own initiative, proceeded with a recount by a method other than voice vote.  She knew at the time the vote was taken that the debtor held a majority of votes present.  She knew that Ms. Brungard and Ms. Hernandez held proxies.  These three individuals were the deciding votes on the motion.[22]  She knew that each unit owner's vote had held a different weight.  She knew that there was substantial opposition to the motion.  She testified that she "heard a number of voices vote in opposition.  I don't know who they were . . . any more than I knew who voted for adjournment."  Tr. at 26.  Voice votes are a simple and effective means to determine whether a motion passes of fails where most of the assembly is of the same opinion.  However, it becomes less reliable as the level of opposition increases particularly in an annual meeting of a condominium unit owners association where there is significant opposition, votes are weighted and individuals hold multiple proxies.  It is wholly unreliable when one voice determines the outcome of a votes and the chair does not know how that voice voted.  In the circumstances presented at this annual meeting, unless Ms. Cuadros determined how Ms. Wilson voted, she was obligated to retake the vote by a method other than a voice vote.  ROBERT'S RULES OF ORDER NEWLY REVISED §4 at 48-49, states:

> *Verifying an inconclusive vote.*  A voice vote . . . may sometimes be inconclusive
> . . . If the chair feels that members may question a somewhat close result of which
> he is reasonably convinced, he can first say, "The ayes [or "the noes"] *seem* to have
> it."  The chair then pauses, and any member who doubts the result is thus invited to
> demand verification of the vote by a *division*, . . . .  If no member makes such a

---

[22]In fact, Ms. Wilson as the debtor's representative was the sole deciding vote.

demand or states that he doubts the result, the chair continues, "The ayes have it . .
.," . . . If the chair is in actual doubt in the case of such a vote, however, he should
not announce a result, but should immediately retake the vote – strictly speaking,
always as a rising vote. . . . If, after a vote has been retaken as an uncounted rising
vote, the chair finds himself still unable to determine the result, he should take the
vote a third time as a *counted* rising vote.

Robert's Rules of Order continue in Section 29:

> VOTE RETAKEN AT CHAIR'S INITIATIVE.  The chair has the responsibility of
> obtaining a correct expression of the will of the assembly.  If he is uncertain of the
> result of a vote or if he feels that the vote is unrepresentative, the chair can on his
> own accord take the vote again by a rising vote.

ROBERT'S RULES OF ORDER NEWLY REVISED §29 at 272.

There were multiple failures at the meeting.  The chair failed to maintain order during the

meeting and thereby prevented business that should properly have been brought before the

association from being presented.  The chair failed to recognize Ms. Brungard for the purpose of

making a motion to adjourn to a fixed time and date.  The chair failed to retake the vote on Mr.

Broncato's motion both because she failed to recognize the request for a division and failed to retake

the vote on her own initiative.  The chair wrongly ruled that the motion passed when it failed by an

overwhelming majority.  The chair wrongly adjourned the meeting.

The debtor argues that the conduct violated the automatic stay, Section 362(a)(6) of the

Untied States Bankruptcy Code.  Its argument relies on the undisputed fact that it held a majority

of votes at the annual meeting and voted against the motion to adjourn.  It argues that if its votes had

been counted, the motion would have failed.  Since the motion passed, it concludes that its votes

were not counted and that it was denied it right to vote, an action that, it says, necessarily violated

the automatic stay.

22

The unit owners association counters that the debtor was allowed to fully participate in the annual meeting and to vote. If it disagreed with the ruling of the chair, the debtor through Ms. Wilson could have sought recognition from the chair and asked for a division of the assembly, that is, a recount of the vote. The debtor, it argues, did not do this, and thus, the unit owners association did nothing wrong.

The weakness of the debtor's argument is that while it is true that the debtor voted against the motion to adjourn, the motion failed even without the debtor's votes. Ms. Brungard and Ms. Hernandez voted their proxies against the motion. They constituted a clear majority against the motion even if the debtor's votes were not counted. Yet, the chair wrongly announced that it had passed. It was not that the debtor's votes were not counted. None of the votes against the motion were counted.

The weakness of the unit owners association's argument is that the chair mismanaged the annual meeting from the time she was advised that no quorum was obtained until she adjourned the meeting. She failed to recognize members who had a right to be recognized. She failed to maintain order. She failed to properly conduct the vote. In the circumstances of the growing disorder and the mismanagement, neither the debtor nor Ms. Brungard had any effective remedy. The chair's conduct was effectively the same as denying them their right to vote.

Looking at the overall circumstances, it is clear that there are major differences of opinion between the current Board of Directors and the debtor. One issue is the extent of the liability of the restaurant unit for condominium fees. The companion bankruptcy case of Condominium Services, Inc., an entity related to the debtor, reflects another issue, the propriety of the discharge of

Condominium Services as managing agent for the condominium.  These flow into a more general

issue, the management of the building and the membership of  the Board of Directors.[23]

In the struggle for control of the Board of Directors, at least four unit owners – three of

whom were members of the Board of Directors – were present at the annual meeting but were not

counted for quorum purposes: Ms. Cuadros, Mr. Broncato, Lt. Brooks and Mr. Terry.  The By-Laws

and the Virginia Code are clear, a unit owner present in person or by proxy is counted for quorum

purposes.  Va.Code (1950) §55-79.76(a); By-Laws Article IV, Section 5.  It is not known if other

directors or other unit owners were present but not counted for quorum purposes.  If there were,

there may well have been a quorum present.

The reasons the four gave for not registering show that they did not want the meeting to go

forward.  Ms. Cuadros, when asked why she did not register stated, "Well, I don't know.  I just

didn't feel like I wanted to vote that day."  Tr. 141.  Mr. Broncato stated, "I did not believe that it

was in the interests of the association to see – to actually have a majority at this time.  So I

personally decided that it was not something I wanted to see happen."  Tr. 154.  Mr. Terry testified

that he did not want to be a part of the quorum because, "A lot of things had been going on that

concerned me about the integrity of the vote, and, honestly, I felt that it was probably better to not

have a quorum that night than potentially let some of the behavior I was concerned about unfairly

influence the vote."  Tr. 176.  Lt. Brooks' answer was lengthier.  The essence was that he did not

want the debtor "taking over the board."  Tr. 165.[24]

---

[23]*See* Testimony of Bryan L. Sells, Tr. at 48; Testimony of Ms. Brungard, Tr. 92 - 94; Testimony of Ms. Hernandez, Tr. at 98 - 102; Testimony of Kevin Broncato, Tr. at 154; Testimony of Lt. Brooks, Tr. at 165; Testimony of Jerry Terry, Tr. at 176.

[24]Lt. Brooks testified:

(continued...)

24

The idea of not holding a meeting by not achieving a quorum did not arise for the first time at the meeting itself.  A quorum was not achieved for the 2007 or the 2008 annual meetings.  The idea was discussed among the unit owners before the meeting.  Mr. Broncato, the Chairman of the Elections Committee, testified that he was aware of these conversations before the meeting.  He testified:

> I've seen people say to each other that it was possible that they didn't want to vote. I did not and I explicitly told them I am not going to tell you one way or the other what to do.  It's not my responsibility.  It's my responsibility to make sure this election is held in fairness.  You all decide what you're going to do.

---

[24](...continued)

THE COURT:    .   .   . Why is it that you didn't register your proxy?

THE WITNESS: There was no vote that was held.  I was waiting to see if we were going to approach quorum or if there was going to be a quorum.

THE COURT:    I don't understand that answer.

THE WITNESS: Well, if we didn't have a quorum, then there would be no reason to submit any sort of ballot. If we were so far away from a quorum, then it also didn't make sense to –

THE COURT:    When were you going to make that decision?

THE WITNESS: Towards the end of the evening, sir.

THE COURT:    You mean after the meeting started?

THE WITNESS: No, sir.  Close enough to time.  Once they started –

THE COURT:    Before the meeting.

THE WITNESS: When they closed off the polls.  Yes, sir.

THE COURT:    So you could be last in line to the polls, so to speak?

THE WITNESS: Essentially.  Yes, sir.

THE COURT:    So you're going to pay attention to what was going on?

THE WITNESS: Certainly.

THE COURT:    And then you were going to make a strategic decision as to whether you were going to register and be counted as a part of the quorum, is that right?

THE WITNESS: Yes, sir.

THE COURT:    And what factors entered into your mind as to whether you should register to be counted as a part of the quorum versus not registering to be counted as part of the quorum?

THE WITNESS: If it appeared as though we were approaching quorum, then I certainly wanted to be counted, have my vote heard.  If it looked as though there was no possibility of a quorum, then I saw no reason to put the ballot forward.  There had been a lot of litigation going on.  There's been a lot of questions about privacy, who might get the ballots based on court decisions, and I wanted to preserve my privacy of how I was voting, if at all possible.

THE COURT:    And do you think that those types of concerns kept people from coming to the meeting?

THE WITNESS: I think those types of concerns kept people from coming to the meeting and also the possibility of Gordon Properties or its representatives taking over the board or the building as it were.  I think a lot of people are concerned about that and could lead to some of the apathy as well as some of the staying home when the voting is taking place.

Tr. 164-165.

Tr. at 155.  Similarly, Lt. Brooks testified that, "There was a lot of talk over the building about whether one should or should not, but I did not come down nor did I encourage anyone to do one thing or the other."  Tr. 163.  They testified that they did nothing to discourage this action.  It can be inferred that they did nothing to encourage attendance at the annual meeting either.

Preventing the election of the Board of Directors by preventing the annual meeting from being held by absence of a quorum was accomplished by Ms. Cuadros.  After Mr. Broncato told her that there was no quorum she recognized him to make a motion to adjourn.  He had not registered for the meeting.  Even though she knew that Ms. Brungard wanted to make a privileged motion to adjourn to a set time and date for the annual meeting to be reconvened, she refused to recognize her and improperly took the vote on the motion to adjourn.[25]  She was an experienced chairperson, skilled at running meetings.[26]  She knew that the votes were weighed and that the outcome of the voice vote was not based on the volume of the voices for or against but the weight of the votes.  She knew that Ms. Wilson represented the debtor at the meeting and that Ms. Wilson's sole voice – however loud or soft –  controlled the outcome of the vote.  Nonetheless, she testified, she did not

---

[25]The By-Laws envision a reasonable adjournment.  By-Laws Article IV, Section 6 states:

> If any meeting of members cannot be organized because a quorum has not attended, the members who are present, either in person or by proxy, may, except as otherwise provided by law, adjourn the meeting to a time not less than forty-eight (48) hours from the time the original meeting was called.

Such an adjournment permits the association to obtain more proxies and better attendance so that business may be transacted, such as electing members of the board of directors.  Proxies "terminate after the first meeting held on or after the date of that proxy or any recess or adjournment of that meeting." Va.Code (1950) §55-79.77(D).  *See also* By-Laws Article IV, Section 8.  Under Mr. Broncato's motion, the proxies expired upon adjournment.  Under Ms. Brungard's motion, the proxies would have remained in full force and effect (unless revoked) until after the reconvened meeting.

[26]Ms. Cuadros has resided in the condominium for thirty years.  She was elected to the Board of Directors in 2005 and was elected president in 2006.  She has chaired five annual meetings which includes the annual meetings since 2007 for which no quorum was obtained and at least two continuances of them.  The manner in which she ran the 2009 meeting showed a familiarity and felicity in running the annual meeting.  It showed a knowledge of the basics of Robert's Rules of Order.  Neither inexperience nor incompetence is an explanation for the manner in which she conducted the meeting.

know who voted for or against the motion.[27]  She wrongly ruled that the motion passed.  Without

adequate time for any further participation from the members, she adjourned the meeting.

The immediate purpose of the actions at the annual meeting was to continue in power the

incumbent Board of Directors.  In addition to Ms. Cuadros' actions, Mr. Broncato who had not

registered for the meeting made the motion to adjourn and Lt. Brooks and Mr. Terry who had not

registered voted in favor of it.  By ignoring Ms. Brungard and her motion to set a date and time for

the annual meeting to reconvene, Ms. Cuadros made it more likely that there would be no election

for a year.  By adjourning sine die, the existing proxies expired.  Both Ms. Brungard and Ms.

Hernandez expended significant effort to obtain the proxies.  Now they have to start all over.

The conduct at the meeting and the motive to prevent the debtor from "taking over the

board" show an abuse of power.  The evidence  is not sufficient to show that the acts taken at the

annual meeting were a part of an effort to collect pre-petition condominium fees.  The deciding

factor is that the debtor was not singled out for special treatment.  Even without its vote, the chair

ruled that the motion to adjourn failed.  Ms. Brungard and Ms. Hernandez voted their proxies against

the motion.[28]  Their combined vote, without the debtor's vote, was more than sufficient to defeat the

motion to adjourn.  In these circumstances, the conduct at the annual meeting was not an act to

collect a pre-petition condominium assessment, but to improperly continue the incumbent Board in

office for another year.

## Conclusion

---

[27]The court does not credit Ms. Cuadros's testimony that she did not register to vote because she did not feel like voting that day or that she did not know Ms. Wilson voted against the motion to adjourn.

[28]M. Brungard acted independently of the debtor.  Tr. at 91-92.

The debtor's motion will be denied.  It should be made clear that the reason for denying the motion is that this court does not have jurisdiction to correct improper corporate actions absent a violation of the automatic stay.  The Virginia circuit court has that jurisdiction and is the proper forum.  This court's jurisdiction is limited to bankruptcy matters, one of which is the enforcement of the automatic stay.  The motion was properly brought.  The unit owners association's conduct at the annual meeting was improper.  However, having concluded that this was an abuse of power and not a violation of the automatic stay, this court has no jurisdiction to correct the abuse.

Alexandria, Virginia
June 2, 2010

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

copies to:

Donald F. King
Linda S. Broyhill

16009